UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JEFF KLUEH and JAKE CAMPBELL, individually, and on behalf of all other similarly situated Illinois residents, <br><br> Plaintiffs, <br><br> v. <br><br> PAUL VALLAS FOR ALL CHICAGO, and LINK2TEK, LLC, <br><br> Defendants. | Case No. 19-cv-00249 <br><br> Judge Martha M. Pacold |

**MEMORANDUM OPINION AND ORDER**

Plaintiffs Jeff Klueh and Jake Campbell filed this class action lawsuit against defendants Paul Vallas for All Chicago and Link2Tek, LLC, alleging that defendants violated the Telephone Consumer Protection Act by sending text messages promoting Paul Vallas as a candidate for Chicago mayor. Before the court is Link2Tek's motion to dismiss the second amended complaint [24]. For the reasons below, the motion is denied.

**BACKGROUND**

In resolving a Rule 12(b)(6) motion, the court assumes the truth of the complaint's well-pleaded factual allegations but not its legal conclusions, and draws all inferences in plaintiffs' favor. *See Zahn v. N. Am. Power & Gas, LLC*, 815 F.3d 1082, 1087 (7th Cir. 2016). The second amended complaint alleges as follows.

Plaintiffs Klueh and Campbell reside in Chicago, Illinois. (Dkt. 23, Compl. ¶¶ 3–4.)[1] Paul Vallas was a candidate in the 2019 Chicago mayoral election. (*Id.* ¶ 35.) Defendant Paul Vallas for All Chicago (the Vallas campaign) is headquartered in Chicago, Illinois. (*Id.* ¶ 5.)[2] Link2Tek is a Delaware corporation with offices in North Carolina that purports to engage in "peer-to-peer" text messaging. (*Id.* ¶¶ 7–11, 26.) The Vallas campaign entered into an agreement with Link2Tek for assistance with communications; from July 2018 through January

---

[1] Docket entries are cited as "Dkt. [docket number]" followed by page number and paragraph citations, as appropriate. Page number citations refer to ECF page numbers.
[2] As discussed below, Link2Tek has raised a question as to the current status of the Vallas campaign.

2019, the Vallas campaign paid Link2Tek $350,000 for "[c]ommunications." (*Id.* ¶¶ 12–13, 77–82.)

Plaintiffs allege that the Vallas campaign "used Link2Tek and [Juliana] Lam to send thousands of *unsolicited* campaign text messages [to] persons identified as living in the Chicagoland area ('Class Members') despite not having the express consent of the Class Members." (Dkt. 23, Compl. ¶ 13 (emphasis in original).)[3] Defendants sent these text messages promoting Paul Vallas to plaintiffs' cellular telephones in the run up to the 2019 mayoral election. (*Id.* ¶¶ 35–38.) The text messages were generic and did not identify the plaintiffs by name. (*Id.* ¶¶ 37–38, 47–48.)

For example, on December 5, 2018, Klueh received the following text message: "FREE MSG. Candidate for Mayor, Paul Vallas,[ ]solves problems & gets results. Read his plan to make Chicago safe, affordable, & prosperous for all: v-9c.com/v4." (Dkt. 23, Compl. ¶ 50.) Klueh did not provide his consent or authorization for this text message, and it came from a 10-digit phone number, deceptively suggesting that it was sent by an individual as opposed to a computerized program. (*Id.* ¶¶ 51–55.) On December 20, 2018, Klueh received another unauthorized text message promoting Vallas for mayor, this time from a five-digit number. (*Id.* ¶¶ 56–58.) Similarly, on January 2, 2019, without his consent or authorization, Campbell received the following text message from a five-digit number: "FREE MSG: Paul Vallas will win the War Against Crime by bringing investment, jobs, & opportunities to ALL of Chicago. Learn more: http://v-9c.com/v8." (*Id.* ¶¶ 60–62.) None of these text messages included the word "STOP," which would have allowed plaintiffs to opt out of future campaign text messages. (*Id.* ¶ 63.)

Plaintiffs allege that the Vallas campaign, or alternatively, Link2Tek, used an automatic telephone dialing system ("ATDS") to send these and the same or similar text messages to thousands of Illinois-based cellular telephone numbers. (*Id.* ¶¶ 59, 67–68.) Plaintiffs further allege that "Link2Tek's operating system allowed Vallas to autofill phone numbers obtained by and through Link2Tek's use of random and/or sequential number generators." (*Id.* ¶ 27.) Plaintiffs also cite Link2Tek's website, which claims that it "match[es] more mobile phone numbers to targeted voters than any other firm." (*Id.* ¶ 28.)

Over four thousand complaints regarding text messages promoting Vallas for mayor were filed with an unidentified third-party organization. (Dkt. 23, Compl. ¶ 69.) The Vallas campaign issued a responsive press release stating that its

---

[3] In response to a prior motion to dismiss, plaintiffs dropped Lam as a defendant. (Dkts. 14, 23.) In the second amended complaint, plaintiffs allege that Lam worked for the Vallas campaign and may have been involved in the text messages, and state that they will amend their complaint "should discovery support this contention." (Dkt. 23 ¶ 83 & n.1.)

2

"communications platform has been thoroughly vetted legally and is legal under FCC guidelines" and that its "vendors follow all rules and regulations." (*Id.* ¶¶ 73, 75.) But "the press release did not refer to any so-called 'FCC guidelines,'" and it "did not specifically refer to any rules or regulations." (*Id.* ¶¶ 74–75.)

The complaint at times asserts that Link2Tek used number generation, but also alleges that Link2Tek used numbers from a list. For example, plaintiffs allege that "Link2Tek violated § 227(b)(1)(iii) of the TCPA by sending Political Text Messages where the Political Text Messages were sent as a result of Link2Tek using software to generate, store and or dial random cellular telephone numbers." (Dkt. 23, Compl., ¶ 39.) On the other hand, plaintiffs allege that "[a]lternatively, Link2Tek violated § 227(b)(1)(iii) of the TCPA by sending Political Text Messages to Plaintiffs and thousands of other persons where the Political Text Messages were sent as a result of Link2Tek using software to create a random sample of cellular telephone numbers from a list of persons obtained from a third-party." (*Id.* ¶ 41.) They also allege that Link2Tek and/or the Vallas campaign obtained an outdated database and random sample of potential Chicago voters from Aristotle International, Inc. (*Id.* ¶¶ 44–45).

Plaintiffs allege that the messages were sent using an automated delivery system that could automatically transmit hundreds of text messages at the same time without meaningful human interaction, "through software that randomly generated samples of intended recipients" (*id.* ¶ 70); that the automated delivery system has the capacity to transmit text messages to cellphone numbers stored in Link2Tek's operating system or to randomly generated cellphone numbers "that are stored and/or otherwise generated by Link2Tek's operating system" (*id.* ¶¶ 71–72); and that defendants knew that plaintiffs' phone numbers were cellphone numbers (*id.* ¶ 65).

Based on these allegations, plaintiffs assert violations of the Telephone Consumer Protection Act (TCPA). (*Id.* ¶¶ 84–113.) Defendants move to dismiss the second amended complaint under Rule 12(b)(6). (Dkt. 24.)

Before turning to the motion to dismiss, the court briefly addresses the status of the Vallas campaign. After the parties briefed the motion to dismiss, the case was transferred to this judge. (Dkt. 43.) The parties filed a reassignment status report. (Dkt. 47.) In that report, Link2Tek raised the status of the Vallas campaign, stating that the campaign "effectively dissolved no later than September 11, 2019 by filing its D-2 Final Report with the Illinois State Board of Elections. Accordingly, Defendant Link2Tek is the sole extant Defendant remaining in this case. Plaintiff disagrees with Link2Tek's position." (*Id.* at 1.) The parties disputed whether the campaign remains a defendant in this case. (*Id.* at 6, 9 (ECF page numbers).)

3

Defendants' counsel has not filed a motion to withdraw on behalf of the Vallas campaign or any other motion based on the campaign's dissolution. More recently, however, the parties filed a joint status report describing the pending motion to dismiss as "Link2Tek's Motion to Dismiss." (Dkt. 58 at 1.) It therefore may be that the parties agree that the pending motion to dismiss now relates only to Link2Tek. (*But see* Dkt. 62 (notice of supplemental authority submitted by both defendants).)

Given the questions surrounding the status of the campaign and whether the campaign is participating in the litigation, to the extent that the campaign may be pursuing the motion to dismiss, the motion is denied without prejudice to renewal once the parties have clarified the status of the campaign, its participation in the litigation, and any effect of its status on whether the motion should be resolved on the merits. The parties should consider the appropriate path forward with respect to the campaign, confer, and inform the court of any next steps they propose in a status report due September 18, 2020 (see below). The court proceeds to address the motion to dismiss with respect to Link2Tek alone.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 8(a)(2), a complaint generally need only include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). This short and plain statement must "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation omitted).

A court may grant a motion to dismiss under Rule 12(b)(6) only if a complaint lacks "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Although a facially plausible claim need not give "detailed factual allegations," it must allege facts sufficient "to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

## ANALYSIS

Link2Tek argues that the complaint should be dismissed on two independent grounds: (1) the complaint does not allege the use of an ATDS and (2) Link2Tek cannot be liable for simply "transmitting" the Vallas campaign's messages. The court addresses these arguments in turn.

**I. Use of an ATDS**

Link2Tek argues that plaintiffs made largely conclusory allegations regarding the use of an ATDS. Link2Tek contends that plaintiffs' only non-conclusory allegations show that Link2Tek used a curated list to send the text messages, such that the complaint does not properly allege the use of an ATDS.

The TCPA provides as relevant:

It shall be unlawful for any person within the United States . . .

(A) to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice--

. . .

(iii) to any telephone number assigned to a . . . cellular telephone service . . . .

47 U.S.C. § 227(b)(1)(A)(iii). "A text message to a cellular telephone, it is undisputed, qualifies as a 'call'" under the TCPA. *Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663, 667 (2016). Accordingly, subject to certain exceptions, the TCPA "prohibits the use of an 'automatic telephone dialing system' to call or text any cellular phone without the prior consent of the recipient." *Gadelhak v. AT&T Servs., Inc.*, 950 F.3d 458, 460 (7th Cir. 2020).

An "automatic telephone dialing system," or ATDS, is defined as:

[E]quipment which has the capacity—

(A) to store or produce telephone numbers to be called, using a random or sequential number generator; and

(B) to dial such numbers.

47 U.S.C. § 227(a)(1). The Seventh Circuit recently explained that the phrase "using a random or sequential number generator" modifies both "store" and "produce," meaning that the system at issue must have the capacity either (1) to store telephone numbers using a random or sequential number generator or (2) to produce telephone numbers using a random or sequential number generator. *Gadelhak*, 950 F.3d at 460. A system that "lacks the capacity either to store or to produce telephone numbers using a number generator" and "[i]nstead . . . dials numbers only from a customer database" is not an ATDS. *Id*. at 464. "[T]he capacity to generate random or sequential numbers is necessary to the statutory definition." *Id*. at 469.

5

"Before *Gadelhak*, the definition of an ATDS was broader [and] include[d] situations where the device dialed numbers from a list, not necessarily a randomly or sequentially generated list." *Mosley v. Gen. Revenue Corp.*, No. 20-cv-01012, 2020 WL 4060767, at *3 (C.D. Ill. July 20, 2020). Indeed, "in 2003 and again in 2008, the FCC determined that 'predictive dialers,' which dial numbers from customer calling lists, fell within the meaning and statutory definition of an [ATDS] and the intent of Congress." *Blow v. Bijora, Inc.*, 855 F.3d 793, 801 (7th Cir. 2017) (citations omitted). But in *ACA International v. FCC*, 885 F.3d 687 (D.C. Cir. 2018), the D.C. Circuit invalided the FCC's previous interpretations of the term "ATDS." *Gadelhak*, 950 F.3d at 463 (citing *ACA Int'l*, 885 F.3d at 695); *see also Pinkus v. Sirius XM Radio, Inc.*, 319 F. Supp. 3d 927, 932 (N.D. Ill. 2018) ("*ACA International* invalidated not only the 2015 Declaratory Ruling's interpretation of the statutory term ATDS, but also the 2008 Declaratory Ruling's and 2003 Order's interpretation of that term."). *Gadelhak* thus interpreted the statutory definition of an ATDS on a clean slate. 950 F.3d at 463. As noted above, *Gadelhak* clarified that a system that "lacks the capacity either to store or to produce telephone numbers using a number generator" and "[i]nstead . . . dials numbers only from a customer database" is not an ATDS. *Id.* at 464. "[T]he capacity to generate random or sequential numbers is necessary to the statutory definition." *Id.* at 469.

The definition of an ATDS generated a circuit split. *Perez v. Quicken Loans, Inc.*, No. 19-cv-2072, 2020 WL 1491145, at *2 (N.D. Ill. Mar. 27, 2020) (citing cases). The Supreme Court recently granted certiorari on "[w]hether the definition of ATDS in the TCPA encompasses any device that can 'store' and 'automatically dial' telephone numbers, even if the device does not 'us[e] a random or sequential number generator.'" *Facebook, Inc. v. Duguid*, No. 19-511, 2020 WL 3865252, at *1 (U.S. July 9, 2020); *Facebook, Inc. v. Duguid*, 2019 WL 5390116 (U.S.), at ii.

Defendants' notice of supplemental authority (Dkt. 62) cited a recent Declaratory Ruling issued by the Chief of the FCC's Consumer and Governmental Affairs Bureau on a petition by the P2P Alliance. *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991, P2P All. Petition for Clarification*, 2020 WL 3511100, at *1 (June 25, 2020). If the ruling is a final order of the FCC, the Hobbs Act requires the court to follow the order absent a direct appeal. *See* 28 U.S.C. § 2342(1); 47 U.S.C. § 402(a); *Blow*, 855 F.3d at 802; *Pinkus*, 319 F. Supp. 3d at 932.

The parties have not briefed whether the ruling is a final order of the FCC. The Chief of the Bureau exercised authority delegated by the Commission in issuing the ruling; the ruling was issued based on "the authority delegated in sections 0.141 and 0.361 of the Commission's rules, 47 CFR §§ 0.141, 0.361." 2020 WL 3511100, at *4. But the finality of the order is unclear, for two reasons. First, it is unclear whether the ruling is subject to, or actually on, review by the full Commission. Second, the ruling itself notes that "[t]he details of the Commission's interpretation of the autodialer definition remain pending in the wake of [*ACA International*] . . . .

6

The Bureau sought renewed comment on the definition of an 'autodialer.' . . . Until that issue is decided by the Commission, we rely on the statutory definition of autodialer." 2020 WL 3511100, at *1 n.2. On the current record, it is an open question whether the ruling is a final order within the meaning of the Hobbs Act.

In any event, as quoted below, the ruling clarified general principles but declined to resolve factual issues about any particular platform. By way of general principles, the ruling states:

> 8. We clarify that the fact that a calling platform or other equipment is used to make calls or send texts to a large volume of telephone numbers is not determinative of whether that equipment constitutes an autodialer under the TCPA. Instead, whether the calling platform or equipment is an autodialer turns on whether such equipment is capable of dialing random or sequential telephone numbers without human intervention. If a calling platform is not capable of dialing such numbers without a person actively and affirmatively manually dialing each one, that platform is not an autodialer and calls made using it are not subject to the TCPA's restrictions on calls to wireless phones. . . .
>
> 9. Under the terms of the TCPA, only technology that has the capacity to store or produce numbers to be called using a random or sequential number generator, and to dial such numbers, is deemed to be an autodialer. Whether a certain piece of equipment or platform is an autodialer turns on whether it is capable of performing those functions without human intervention, not whether it can make a large number of calls in a short time. . . .

2020 WL 3511100, at *3 ¶¶ 8–9 (footnote omitted).

But the ruling also explains:

> 11. We do not rule on whether any particular P2P text platform is an autodialer because the record lacks a sufficient factual basis for us to confirm (or for commenters to assess) whether any particular P2P text platform actually works as claimed in the P2P Alliance Petition. . . .

*Id*. at *4 ¶ 11.

The court turns to the sufficiency of the complaint. Federal pleading standards require that "[t]he complaint must do more than recite the elements of a cause of action in a conclusory fashion." *Roberts v. City of Chicago*, 817 F.3d 561, 565 (7th Cir. 2016) (citing *Iqbal*, 556 U.S. at 678). The complaint must allege facts sufficient "to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

As relevant here, the TCPA requires the use of an ATDS (or an artificial or prerecorded voice, which plaintiffs do not allege here). Again, under *Gadelhak*, a system that "lacks the capacity either to store or to produce telephone numbers using a number generator" and "[i]nstead . . . dials numbers only from a customer database" is not an ATDS. 950 F.3d at 464. The system must have "the capacity to generate random or sequential numbers." *Id.* at 469; *see also Perez,* 2020 WL 1491145, at *2 (post-*Gadelhak*, dismissing complaint alleging a significant pause after answering calls and regular calls after plaintiff demanded that the calls stop); *Mosley*, 2020 WL 4060767, at *4 (post-*Gadelhak*, dismissing complaint after looking to the nature of the company at issue, a debt collection company, and noting that "Plaintiff offers no plausible explanation why a debt collection company would need or use a machine which had the capacity to dial or store randomly or sequentially generated numbers. It is far more likely that a telemarketing company, bank, or other seller of goods would desire to have machines with the capacity to dial randomly or sequentially generated numbers."). In light of the circuit split, plaintiffs' reliance on cases outside the Seventh Circuit is unpersuasive.

But *Gadelhak* was decided at summary judgment, not at the pleading stage before discovery. As other courts have observed (pre-*Gadelhak*), it is unclear how plaintiffs can plead the technical details of the system used by a defendant when the defendant has that information. *Zeidel*, 2019 WL 2161546, at *4; *Jara*, 2020 WL 433869, at *2.[4]

Moreover, the system must have the "capacity" to store or produce numbers using a random or sequential number generator. § 227(a)(1). Link2Tek argues that the complaint fails to plausibly allege that the system had the required number generation capacity. But Link2Tek does not argue that the complaint must plausibly allege that the system actually deployed that capacity in sending the text messages at issue.

Some of plaintiffs' allegations merely recite the words of the statute and allege that Link2Tek used an ATDS or "random and/or sequential number generators." (*E.g.*, Dkt. 23 ¶ 27.) These allegations are conclusory.

---

[4] Joint status reports filed by the parties indicate that Link2Tek has produced to plaintiffs "any product manual describing the operation, functionality and capacity of the Link2Tek text messaging platform." (Dkt. 47 at 4; s*ee also* Dkt. 58 at 1 ("Link2Tek responded to certain discovery requests concerning . . . any product manual describing the operation, functionality and capacity of the Link2Tek text messaging platform.").) Nonetheless, it is unclear whether discovery on the relevant technical capacity of the platform is complete. Even if discovery on that topic were complete, none of the relevant documents is before the court, nor has either party argued that it would be appropriate to consider them on a motion to dismiss. The court does not consider any such exchange in this decision.

Other allegations refer to the generic nature and high volume of the text messages. These allegations are indicative of some type of automated system. But they are just as consistent with the use of a system that dials from a list or database of numbers but lacks the required number generation capacity (and therefore is not an ATDS) as with a system that has the required capacity (and therefore is an ATDS). So they provide little support for the plausibility of the allegation that Link2Tek used an ATDS.

Other allegations expressly allege that the numbers came from a list or database of potential voters, that the messages were sent to persons identified as living in the Chicagoland area, and that the numbers were Illinois-based. These allegations suggest that the numbers were not randomly or sequentially generated, but that the messages were directed to specific numbers. These allegations affirmatively cut against an inference that Link2Tek's messaging platform actually employed random or sequential number generation capacity (if the system had that capacity) in sending the text messages at issue.

However, whether Link2Tek's system had that capacity as a general matter is a different question from whether the system employed that capacity in sending the messages in question. These allegations suggest that the Vallas campaign had no reason to seek out a messaging platform that had random or sequential number generation capacity. But the allegations also do not directly suggest that Link2Tek's platform lacks that capacity. No one claims, for example, that Link2Tek's platform is tailored to a particular industry that might or might not tend to use random or sequential number generation capacity. *Compare Mosley*, 2020 WL 4060767, at *4.

Plaintiffs also allege that more than 4,000 complaints were lodged regarding these text messages. The high number of complaints might come closer than the other allegations to plausibly suggesting that the messages were sent to randomly or sequentially generated numbers rather than a specified list. If, for example, a substantial portion of the total messages sent generated complaints, that might suggest that the messages were sent to randomly or sequentially generated numbers rather than directed to a list of recipients who might be receptive to the messages. Plaintiffs allege that the total number of messages sent was in the thousands, but it is unclear whether that means something closer to 4,000, 10,000, or 900,000. And even assuming both that plaintiffs need not plead the total number of messages sent and that a large portion of the messages sent resulted in complaints, 4,000 complaints could be equally consistent with the use of a list of numbers whose owners did not want the messages as with the use of randomly or sequentially generated numbers. Thus, 4,000 complaints does not necessarily make a significant difference in assessing whether the complaint sufficiently alleges the required number generation capacity.

Considering all the circumstances of this particular case, including that technical information about whether the system has the required capacity is within Link2Tek's control and the absence of any argument that the complaint must plausibly allege actual employment of the required capacity in sending the messages at issue, this case presents evidentiary issues about the capacity of the platform that are more appropriate for resolution at a later stage. *See Johnson v. Yahoo!, Inc.*, 346 F. Supp. 3d 1159 (N.D. Ill. 2018) (summary judgment stage); *Folkerts v. Seterus, Inc.*, No. 17-cv-04171, 2019 WL 1227790 (N.D. Ill. Mar. 15, 2019) (same); *Gadelhak v. AT&T Servs., Inc.*, No. 17-cv-01559, 2019 WL 1429346 (N.D. Ill. Mar. 29, 2019) (same).[5]

Discovery about whether the system had the required capacity may be fairly discrete. The parties should prioritize limited discovery on that topic and propose an appropriate plan in the September 18, 2020 joint status report (see below).

## II. Link2Tek's Role

Link2Tek also contends that it should be dismissed because plaintiffs' allegations do not specify each defendant's role in sending the text messages, and because Link2Tek, as a service provider, cannot be liable for simply "transmitting" the Vallas campaign's messages. (Dkt. 26 at 14–17; *see also* Dkt. 24 at 2 ¶ 3.) These arguments are not persuasive.

First, as to the argument about specifying Link2Tek's role, the complaint provides Link2Tek sufficient notice of the claims against it. As set forth above, Rule 8(a)(2) "requires only a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555. Plaintiffs may direct certain allegations at multiple defendants, so long as the complaint gives each defendant notice of what it allegedly did to violate the law, i.e., "some specific facts to ground [plaintiff's] legal claims." *Brooks v. Ross*, 578 F.3d 574, 581–82 (7th Cir. 2009); *see also Mauer v. Am. Intercontinental Univ., Inc.*, No. 16-cv-01473, 2016 WL 4651395, at *3 (N.D. Ill. Sept. 7, 2016) ("While [plaintiff] must ultimately prove each individual Defendant's role and relationship to the John Doe caller, she need only generally allege her agency claim so as to provide each Defendant notice of the claims against them at this stage."); *Chatman v. City of Chicago*, 14-cv-02945, 2015 WL 1090965, at *4 (N.D. Ill. Mar. 10, 2015); *E.R. James Real Estate Servs., LLC v. Spinell*, No. 11-cv-04476, 2011 WL 5078873,

---

[5] Resolution on the pleadings is appropriate under other circumstances. *See Pinkus*, 319 F. Supp. 3d at 939 (N.D. Ill. 2018) (granting partial motion for judgment on the pleadings when plaintiff "concedes that his complaint does not plausibly allege that he was called with a device that has the capacity to store or produce numbers that have been randomly or sequentially generated"); *Bader v. Navient Sols., LLC*, No. 18-cv-01367, 2019 WL 2491537, at *2 (N.D. Ill. June 14, 2019) (granting motion to dismiss when plaintiff described device as a "predictive dialer"); *Perez*, 2020 WL 1491145, at *2; *Mosley*, 2020 WL 4060767, at *4.

at *4 (N.D. Ill. Oct. 26, 2011) ("Defendants seem to have unique control over the information as to which of them, if any, removed files. Under these circumstances, making an allegation on information and belief does not contravene *Twombly* or *Iqbal*."). Plaintiffs allege that the Vallas campaign hired Link2Tek to assist with communications, that the campaign "used Link2Tek . . . to send thousands of *unsolicited* campaign text messages," and that "Link2Tek . . . sent thousands of unsolicited and generic Political Text Messages." (Dkt. 23, Compl. ¶¶ 12–13 (emphasis in original), 35–38, 56–62, 77–82.) The complaint provides Link2Tek sufficient notice of the claims against it. Further details about the respective roles of the Vallas campaign and Link2Tek are matters for discovery.

Second, Link2Tek's argument regarding "transmitting" the text messages is not consistent with the allegations in the complaint. The TCPA makes it unlawful "to make any call [] . . ." or send any text message to a cellular telephone using an ATDS without the consent of the owner. 47 U.S.C. § 227(b)(1)(A) (emphasis added); *see also Franklin v. Express Text, LLC*, 727 F. App'x 853, 854 (7th Cir. 2018) (defendant "can be liable only if it 'ma[d]e any call' or sent any text message"). As Link2Tek points out, the applicable federal regulations use the word "initiate" rather than "make." 47 C.F.R. § 64.1200(a) ("No person or entity may: (1) Except as provided in paragraph (a)(2) of this section, initiate any telephone call (other than a call made for emergency purposes or is [*sic*] made with the prior express consent of the called party) using an automatic telephone dialing system or an artificial or prerecorded voice; . . . (iii) To any telephone number assigned to a . . . cellular telephone service . . ."). Based on this language, Link2Tek contends that it cannot be liable under the TCPA because it only "transmitted" messages; it did not send or initiate them. (Dkt. 26 at 15–16.) Whether or not this ultimately proves true after discovery, at the pleading stage, the court must accept all well-pleaded facts as true. The complaint alleges that either Link2Tek, the Vallas campaign, or both sent the text messages. Specifically, it alleges that the Vallas campaign "used Link2Tek . . . to send thousands of unsolicited campaign text messages," and that "Link2Tek . . . sent thousands of unsolicited and generic Political Text Messages." (Dkt. 23 ¶¶ 13, 38.) The complaint sufficiently alleges that Link2Tek sent or initiated the text messages in question.[6]

---

[6] Link2Tek also cites authority discussing common carriers, but it does not contend that it is a common carrier. If Link2Tek were to raise such a defense, the court would need to consider whether that defense could or should be adjudicated at the motion to dismiss stage and, if so, merits issues surrounding that defense (e.g., whether Link2Tek in fact was a common carrier; if so, whether it should still be liable for the messages because it either exercised a high degree of involvement or had notice of the prohibited use, *see Payton v. Kale Realty, LLC*, 164 F. Supp. 3d 1050, 1056–57 (N.D. Ill. 2016) (collecting cases)). None of these issues have been briefed and the court declines to reach them.

## CONCLUSION

Link2Tek's motion to dismiss is denied [24]. The parties are directed to meet and confer and to submit by September 18, 2020, a joint status report on the topics discussed above: (1) the status of the campaign and its participation in the litigation and next steps for resolving any disagreement between the parties on these matters, and (2) a plan for limited discovery on whether Link2Tek's system had the required capacity under *Gadelhak*.

Date: August 24, 2020                                         /s/ Martha M. Pacold